**CASE NO. 17-35572**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

FRIENDS OF THE WILD SWAN, et al.,
Appellants,

v.

ROBYN THORSON, et al.,
Respondents,

---

**AMICUS BRIEF OF CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, AND SIERRA CLUB IN SUPPORT OF APPELLANTS AND IN FAVOR OF REVERSAL**

---

ELIZABETH FORSYTH
Earthjustice
800 Wilshire Boulevard, Ste. 1000
Los Angeles, CA 90017
Tel: (415) 217-2000
Fax: (415) 217-2040

TIMOTHY J. PRESO
Earthjustice
313 E. Main St.
Bozeman, MT 59715
Tel: (415) 217-2000
Fax: (415) 217-2040

*Attorneys for*
*Conservation Amici*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(a)(4)(A), amici curiae Center for Biological Diversity, Defenders of Wildlife, and Sierra Club confirm that they have no parent companies and that no publicly held corporations own 10 percent or more of any of the organizations.

**TABLE OF CONTENTS**

INTEREST OF AMICI ........................................................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 3

ARGUMENT ......................................................................................................... 4

I. RECOVERY PLANS ARE A CRITICAL REQUIREMENT OF THE ENDANGERED SPECIES ACT. ........................................................... 4

II. THE COURT MAY REVIEW THE ADEQUACY OF A RECOVERY PLAN UNDER THE ENDANGERED SPECIES ACT'S CITIZEN SUIT PROVISION. ................................................... 15

CONCLUSION .................................................................................................... 28

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. Bozeman*,
533 U.S. 146 (2001)....................17

*Alyeska Pipeline Serv. Co. v. Wilderness Society*,
421 U.S. 240 (1975)....................16

*Association of California Water Agencies v. Evans*,
386 F.3d 879 (9th Cir. 2004) ....................18, 19, 24

*Bennett v. Spear*,
520 U.S. 154 (1997)....................*passim*

*Biodiversity Legal Found. v. Norton*,
285 F. Supp. 2d 1 (D.D.C. 2003)....................7

*Center for Biological Diversity v. Bartel*,
470 F. Supp. 2d 118 (S.D. Cal. 2006)....................8

*Center for Biological Diversity v. Bureau of Land Management*,
35 F. Supp. 3d 1137 (N.D. Cal. 2014)....................20

*Center for Biological Diversity v. Kempthorne*,
607 F. Supp. 2d 1078 (D. Ariz. 2009) ....................20

*Cottonwood Environmental Law Center v. United States Forest Service*,
789 F.3d 472 (9th Cir. 2011) ....................16

*Defenders of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001)....................2, 22

*Defenders of Wildlife v. Jewell*,
No. CV-14-02472-TUC-JGZ, 2015 WL 11182029 (D. Ariz. Sept. 30, 2015) ....................20

*Friends of Blackwater v. Salazar*,
691 F.3d 428 (D.C. Cir. 2012) .......... 12

*Friends of the Wild Swan, Inc. v. Thorson*,
No. 3:16-cv-681-AC, slip op. (D. Or. Jan. 5, 2017) .......... 23

*Friends of the Wild Swan, Inc. v. Thorson*,
No. 3:16-cv-681-AC, 2017 WL 2399572 (D. Or. June 1, 2017) .......... 1, 23, 25

*Friends of the Wild Swan v. Ashe*,
18 F. Supp. 3d 1077 (D. Mont. 2014) .......... 20

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995) .......... *passim*

*Gifford Pinchot Task Force v. United States Fish & Wildlife Service*,
378 F.3d 1059 (9th Cir.) .......... 4

*Gonzalez v. Thaler*,
565 U.S. 134 (2012) .......... 17

*Grand Canyon Trust v. Norton*,
No. 04-CV-636PHXFJM, 2006 WL 167560 (D. Ariz. Jan. 18, 2006) .......... 2

*Grand Canyon Trust v. Bureau of Reclamation*,
691 F.3d 1008 (9th Cir. 2012) .......... 7

*Kennecott Copper Corporation v. Costle*,
572 F.2d 1349 (9th Cir. 1978) .......... 24, 25

*Natural Resources Defense Council v. United States Department of the Interior*,
113 F.3d 1121 (9th Cir. 1997) .......... 27

*National Wildlife Federation v. National Marine Fisheries Services*,
524 F.3d 917 (9th Cir. 2008) .......... 27

*Our Children's Earth Foundation v. United States Environmental Protection Agency*,
527 F.3d 842 (9th Cir. 2008) .......... 17

*Palila v. Hawaii Department of Land & Natural Resources*,
471 F. Supp. 985 (D. Haw. 1979)....................................................................9

*Southwest Center for Biological Diversity v. Bartel*,
470 F. Supp. 2d 1118 (S.D. Cal. 2006)............................................................8

*Western Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ....................................................................16, 25

*Washington Toxics Coalition v. United States Environmental Protection Agency*,
413 F.3d 1024 (9th Cir. 2005) ..........................................................................16

*WildEarth Guardians v. McCarthy*,
772 F.3d 1179 (9th Cir. 2014) ..........................................................................17

**Statutes**

5 U.S.C. § 704..................................................................................................16

16 U.S.C. § 1531..................................................................................................4

16 U.S.C. § 1532..................................................................................................4

16 U.S.C. § 1533........................................................................................ *passim*

16 U.S.C. § 1540....................................................................................3, 16, 26

33 U.S.C. § 1365................................................................................................16

42 U.S.C. § 6972................................................................................................16

42 U.S.C. § 7604................................................................................................16

42 U.S.C. § 9659................................................................................................16

**Other Authorities**

Daniel J. Rohlf, *The Endanged Species Act: A Guide to Its Protections and Implementation* (1989)..................................................................................5

Endangered and Threatened Wildlife and Plants: Removing the Bald Eagle in the Lower 48 States From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 37,346 (July 9, 2007) ....................................7

Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, 92 Stat. 3751 ....................................................................................5

Endangered Species Act Ammendments of 1988, Pub. L. No. 100-478, 102 Stat. 2306 ............................................................................6

Federico Cheever, *The Road to Recovery: A New Way of Thinking About the Endangered Species Act*, 23 Ecology L.Q. 1 (1996) ..........................9

J. Alan Clark, et al., *Improving U.S. Endangered Species Act Recovery Plans: Key Findings and Recommendations of the SCB Recovery Plan Project*, 16 Conservation Biology 1510 (2002) ..........................7

Jason M. Patlis, *Recovery, Conservation, and Survival Under the Endangered Species Act: Recovering Species, Conserving Rescources, and Saving the Law*, 17 Pub. Land & Resources L. Rev. 55 (1996) ..........................................................................13

Jordan Curnutt, *Animals and the Law: A Sourcebook* (2001) ...............................13

U.S. Fish and Wildlife Service, *Report to Congress on the Recovery Program for Threatened and Endangered Species* (1996)..................................5

Riccola J. Voigt, *Recovery Planning, Science, and Flexibility Under the Endangered Species Act*, 32 T. Jefferson L. Rev. 139 (2009) .......................8

S. Rep. No.100-240 (1987) ........................................................................6

Timothy H. Tear et al., *Status and Prospects for Success of the Endangered Species Act: A Look at Recovery Plans*, 262 Science 976 (Nov. 12, 1993) ..............................................................................10

U.S. Gov't Accountability Office, GAO-06-730, *Endangered Species: Many Factors Affect the Length of Time to Recover Select Species* (2006) .....................................................................................8

## INTEREST OF AMICI

Amici curiae Center for Biological Diversity, Defenders of Wildlife, and Sierra Club ("Conservation Amici") submit this brief to address a critical issue arising from the district court's holding in this case—whether a federal court may review under the citizen suit provision of the Endangered Species Act ("ESA" or "the Act") a recovery plan under Section 4(f) of the ESA, 16 U.S.C. § 1533(f), to determine whether it provides for the conservation and survival of the species.[1]

Conservation Amici have worked for decades to ensure vigorous application and enforcement of the ESA and collectively represent millions of Americans who support protection and restoration of our native wildlife. The decision below threatens to undermine this body of work and the interests of Conservation Amici's members. In the decision below, the district court addressed a challenge to the ESA recovery plan for bull trout and ruled that the federal courts may review the question whether an ESA recovery plan mentions the items listed in 16 U.S.C. § 1533(f), but not whether those items are actually designed to provide for conservation and survival of the species as required by that section. *See Friends of the Wild Swan v. Thorson*, No. 3:16-cv-00681-AC, 2017 WL 2399572, at *2–4 (D. Or. June 1, 2017), ER 5. This ruling contravenes Congress's intent and undermines

[1] No party's counsel authored this brief in whole or in part, and no person other than Conservation Amici contributed money to fund preparing or submitting the brief.

the core purpose of the ESA—species recovery—by threatening to make the most central aspect of recovery planning required under Section 4 of the Act immune from judicial review.

This Court has not addressed the question of whether federal courts may review under the ESA citizen suit provision a species recovery plan's consistency with the requirements delineated in 16 U.S.C. § 1533(f). As discussed below, the district court's reasoning on this issue was flawed. Furthermore, the district court's conclusion in this case built upon the foundation of another determination by a district court in this Circuit that similarly held that the substance of an ESA recovery plan is beyond the scope of judicial review pursuant to the Act's citizen suit provision. *See Grand Canyon Tr. v. Norton*, No. 04-CV-636PHXFJM, 2006 WL 167560, at *2–3 (D. Ariz. Jan. 18, 2006). These rulings stand in tension with decisions issued by the U.S. District Court for the District of Columbia, which has twice resolved challenges to the substance of ESA recovery plans, and has found elements of such plans to be inconsistent with the ESA, albeit without expressly addressing the jurisdictional issue discussed by the court below. *See Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133–34 (D.D.C. 2001); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 110–15 (D.D.C. 1995), *amended,* 967 F. Supp. 6 (D.D.C. 1997). The erroneous reasoning adopted in the referenced district court holdings from this Circuit, if left uncorrected, threatens to render meaningless the

ESA citizen suit provision and enable unchecked agency misconduct in the context of ESA recovery planning. Accordingly, this Court should reverse the decision below.

## SUMMARY OF ARGUMENT

Recovery of threatened and endangered species is the cornerstone and ultimate purpose of the ESA. To aid in this recovery, the ESA requires the Secretary of the Interior ("Secretary"), acting through U.S. Fish and Wildlife Service ("Service") and National Marine Fisheries Service, to prepare plans "for the conservation and survival" of threatened and endangered species. 16 U.S.C. § 1533(f). These "recovery plans" must contain, to "the maximum extent practicable," (1) a description of the site-specific management actions that are needed for conservation and survival of the species; (2) objective, measurable criteria that, when met, will result in the determination that a species may be removed from the endangered and threatened species list; and (3) time and cost estimates to carry out the measures needed to achieve the plan's goals and intermediate steps. *Id.* These requirements for recovery plans are not discretionary. The ESA's citizen suit provision allows citizens to bring suit for failure to perform nondiscretionary duties imposed by Section 4 of the Act, which includes the recovery plan obligations. 16 U.S.C § 1540(g). The Service's failure to issue a recovery plan that meets the requirements in 16 U.S.C. § 1533(f), including that it

provide for "conservation and survival" of the species, is therefore reviewable under the ESA's citizen suit provision, and the Court should reverse the district court's holding making the most important aspect of recovery plans immune from judicial review.

## ARGUMENT

### I. RECOVERY PLANS ARE A CRITICAL REQUIREMENT OF THE ENDANGERED SPECIES ACT.

Recovery planning is at the heart of the ESA's statutory scheme for survival and restoration of imperiled wildlife. Congress enacted the ESA in 1973 to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The Act defines "conservation" to mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). Thus, as this Court has observed, "the ESA was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir.), *amended on other grounds by* 387 F.3d 968 (9th Cir. 2004).

Although species recovery is "the cornerstone and ultimate purpose of the endangered species program," the original ESA had no explicit mandate for how to achieve species recovery. Service, *Report to Congress on the Recovery Program for Threatened and Endangered Species* 2 (1996), *available at* https://www.fws.gov/endangered/esa-library/pdf/1996-1.pdf. Congress therefore added an amendment in 1978 requiring the Secretary of the Interior to develop and implement recovery plans. Endangered Species Amendments of 1978, Pub. L. No. 95-632, sec. 11(5), 92 Stat. 3751, 3766 (1978). The amendment, however, did not include direction beyond the command that the plans provide for "conservation and survival" of species. *Id.* This lack of direction led to plans that included only vague goals and directives and thus did "little to implement uniform comprehensive conservation programs to benefit listed species." Daniel J. Rohlf, *The Endangered Species Act: A Guide to Its Protections and Implementation* 90 (1989) (detailing the inadequacies of early recovery plans). For example, the early Northern Rocky Mountain Wolf Recovery Plan merely directed federal agencies to "minimize direct, man-caused mortality" by "minimizing or resolving conflicts between wolf recovery objectives and man." *Id.* (quoting Service, *Northern Rocky Mountain Wolf Recovery Plan* (1985)). The plan provided no discrete, site-specific management actions to prescribe how "conflicts" would be "minimize[d]," nor any

objective, measurable criteria to judge whether recovery had been achieved, making the plan difficult to implement. *Id.*

Recognizing that recovery plans were failing to "include consistently criteria, time frames and estimated costs for recovery," Congress again amended the ESA in 1988. S. Rep. No. 100-240, at 4 (1987). In the 1988 amendments, Congress sought to "ensure that plans are as explicit as possible in describing the steps to be taken in the recovery of a species" by requiring the plans include "means by which to judge the progress being made toward recovery." *Id.* at 9. Per the amendments, recovery plans now must include, to the maximum extent practicable, (1) a description of the site-specific management actions that are needed for conservation and survival of the species; (2) objective, measurable criteria that, when met, will result in the determination that a species may be removed from the endangered and threatened species list; and (3) time and cost estimates to carry out the measures needed to achieve the plan's goals and intermediate steps. Endangered Species Act Amendments of 1988, Pub. L. No. 100-478, sec. 1003, 102 Stat. 2306, 2306–07 (1988); 16 U.S.C. § 1533(f)(B).

As a result, today recovery plans are central to meeting the ESA's species-recovery goals. As the umbrella document that guides all conservation planning efforts, "high-quality recovery plans can help shift the focus of recovery efforts beyond stop-gap measures meant to prevent extinction, toward systematic and

strategically coordinated actions aimed at alleviating threats and restoring natural ecosystems to a state in which populations are self-sustaining." J. Alan Clark, et al., *Improving U.S. Endangered Species Act Recovery Plans: Key Findings and Recommendations of the SCB Recovery Plan Project*, 16 Conservation Biology 1510, 1511 (Dec. 2002). Recovery plans aid species recovery by helping to focus and prioritize funding and management actions, and they guide other regulatory actions, such as designation of critical habitat and removal of species from the endangered species list under 16 U.S.C. § 1533(a)(1) and (a)(3)(A). *See, e.g., Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1, 13–14, 16 (D.D.C. 2003) (holding that the recovery plan for the seaside sparrow, which found the species' current critical habitat designation inadequate and suggested a revision, gave rise to the Service's duty to revise the species' critical habitat designation in a timely fashion); Endangered and Threatened Wildlife and Plants: Removing the Bald Eagle in the Lower 48 States From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 37,346, 37,347 (July 9, 2007) (delisting the bald eagle when breeding pairs significantly exceeded the numeric goals set by recovery plans). Further, as a practical matter, the Service relies on conclusions reached in the process of recovery planning to guide a variety of important decisions about the needs of, and impacts to, imperiled wildlife. *See, e.g., Grand Canyon Trust v. Bureau of Reclamation*, 691 F.3d 1008, 1023–24 (9th Cir. 2012) (noting that the

Service relied on draft recovery goals for humpback chub in an ESA section 7 biological opinion both "as the best available science to define recovery of the chub" and to support "conclusions about an agency action's effect on [the chub's] recovery"); *Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1136–37 (S.D. Cal. 2006) ("The Vernal Pool Recovery Plan is pertinent evidence of the measures necessary to prevent the extinction of the vernal pool species."), *appeal dismissed and remanded on mootness grounds*, 409 F. App'x 143 (9th Cir. 2011).

The U.S. Government Accountability Office, in a 2006 review of species recovery, noted that success in recovering imperiled species "can be attributed, at least in part, to actions in the species' recovery plans." GAO-06-730, *Endangered Species: Many Factors Affect the Length of Time to Recover Select Species* 4 (2006). For example, when the recovery plan for the Northern spotted owl cited loss of critical habitat due to logging in old-growth forests as the most significant threat, it resulted in a forest plan that dramatically reduced logging and set aside 24 million acres of federal land as a refuge for the species. *See* Riccola J. Voigt, *Recovery Planning, Science, and Flexibility Under the Endangered Species Act*, 32 T. Jefferson L. Rev. 139, 139 (2009). And when the recovery plan for the palila, an endemic Hawaiian bird, identified that the bird could not survive without the mamane-naio forest, the Hawaii federal district court used this information in its

finding that Hawaii's Department of Land and Natural Resources was unlawfully harming the palila by allowing feral sheep and goats to destroy the forest. *Palila v. Hawaii Dep't of Land & Nat. Res.*, 471 F. Supp. 985, 988 n.4, 989 n.7, 990 n.13 (D. Haw. 1979), *aff'd*, 639 F.2d 495 (9th Cir. 1981); *see also* Federico Cheever, *The Road to Recovery: A New Way of Thinking About the Endangered Species Act*, 23 Ecology L.Q. 1, 42–48 (1996) (discussing the palila's recovery plan and explaining the importance of recovery plans as forming the basis for courts' evidentiary findings). The feral sheep and goats were ultimately reduced, allowing the forest to recover and the palila's prospects to improve. Service, *Draft Revised Recovery Plan for Hawaiian Forest Birds* 57–62 (2003), *available at* https://www.fws.gov/pacific/ecoservices/endangered/recovery/documents/HawaiiForestBirdsDraftRevisedRecoveryPlan.pdf. Recovery plans accordingly make a real-world, practical difference in the conservation and recovery of our nation's most fragile species—if they legitimately reflect consideration of the relevant factors, including the best available scientific information.

Because of the central role of recovery plans in ensuring species' conservation and recovery, it is imperative that recovery plans be robust and meet the ESA's requirements. For example, in a study published in the journal *Science*, the study's authors reviewed 314 recovery plans and found that "[c]rucial to the success of the recovery process is that recovery goals depict biologically defensible

estimates that will ensure population viability." Timothy H. Tear et al., *Status and Prospects for Success of the Endangered Species Act: A Look at Recovery Plans*, 262 Science 976, 976 (Nov. 12, 1993). Yet startlingly, the authors found that in many cases existing recovery plans set goals "that risk extinction rather than ensure survival." *Id.*

Courts therefore fill a critical role in ensuring that the recovery goals stated in recovery plans actually ensure species conservation and survival and comply with all of the requirements in ESA Section 4(f). For example, the court in *Fund for Animals*, 903 F. Supp. at 110–15, carefully parsed the recovery plan for the grizzly bear and evaluated whether the criteria included in the plan were adequately directed toward the goal of removing the species from the endangered species list. The court held that because the criteria used to measure the grizzly's progress in the plan did not address the ESA's statutory factors for delisting in 16 U.S.C. § 1533(a), the plan was inadequate under the ESA. *Id.* For example, habitat loss was acknowledged by all the parties to be a significant threat to grizzly recovery, and the ESA requires the Secretary to evaluate the present or threatened destruction of habitat when proposing to delist a species, 16 U.S.C. § 1533(a)(1)(A), (b), (c). Yet the grizzly recovery plan's only criteria for success—the number and distribution of females with cubs and the annual number of human-caused mortalities—did not directly address grizzly habitat loss. The court

accordingly found the plan deviated from the requirements imposed by the ESA. *Fund for Animals*, 903 F. Supp. at 112.

Similarly, the court in *Defenders of Wildlife*, 130 F. Supp. 2d at 133–34, painstakingly reviewed the recovery plan for the Sonoran pronghorn. With only 120–250 members of the species still in existence, the Sonoran pronghorn faces threats from drought, degradation of habitat, the diminishing size of the Gila and Sonoyta rivers, and human encroachment. *Id.* at 123. But the recovery plan addressed only criteria to reclassify the Sonoran pronghorn from endangered to threatened, and did not bother determining how to fully recover the species and remove it from the list altogether. Moreover, just like the deficient grizzly recovery plan, the Sonoran pronghorn plan did not address the ESA's statutory requirements for delisting, including the threats from drought and habitat loss. Instead, the plan merely allowed for the Sonoran pronghorn to be downlisted from endangered to threatened once population numbers reached a certain threshold. The court found that the plan was inadequate for failing to address the statutory requirements for

delisting, and for failing to plan for the species' removal from the endangered species list altogether. *Id.* at 133.[2]

This type of careful judicial review is essential to ensure the proper functioning of the ESA's recovery planning requirements. If the *Fund for Animals* court had held the substance of the grizzly bear plan's measures for recovery to be immune from judicial review, it might have led to a situation where recovery planning efforts improperly focused on numeric markers (the number of females with cubs) that could mask or obscure the real barriers to the species' recovery (habitat loss). *See generally* Jason M. Patlis, *Recovery, Conservation, and Survival Under the Endangered Species Act: Recovering Species, Conserving Resources,*

[2] Although the D.C. Circuit, in a split opinion, has held that all of the criteria in a recovery plan need not be satisfied before a species may be removed from the list of endangered and threatened species, *see Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012), that court has not called into question the validity of the district court rulings reviewing whether recovery plans adequately satisfy the Section 4(f) criteria or are otherwise arbitrary or capricious. To the contrary, both the majority and dissenting opinions in *Friends of Blackwater* agreed that the ESA imposes important mandatory duties on what the Service must include in recovery plans. *See id*. at 436-37 ("Nor do we doubt § 4(f)(1) of the Act imposes mandatory obligations upon the Secretary. The Secretary shall, for example, develop a recovery plan for an endangered species . . . , which plan shall include 'objective, measurable criteria' . . . . That is, *as long as a species is listed as endangered, the agency is obligated to work towards the goals set in its recovery plan*.") (emphasis added); *id*. at 441 (Rogers, dissenting) ("it is difficult to imagine how Congress could have spoken more clearly and directly when it strengthened the ESA in 1988 . . . by mandating both development and implementation, prior to delisting, of recovery plans that include 'objective, measurable criteria'").

*and Saving the Law*, 17 Pub. Land & Resources L. Rev. 55, 65 (1996) (explaining why "[p]opulation abundance alone . . . is not a sufficient criterion for recovery" because even when a population's abundance is sufficient, threats and adverse impacts "may quickly reduce it below minimum viability"). Instead, the court's order required the Service to prepare a plan that included habitat-based recovery criteria with minimum habitat security parameters for grizzly recovery. *Fund for Animals*, 903 F. Supp. at 112; *see also* Jordan Curnutt, *Animals and the Law: A Sourcebook* 409–10 (2001) (noting that the Service subsequently prepared a plan addressing the defects identified by the court, including establishing habitat-based recovery criteria).

Similarly with the Sonoran pronghorn, had the *Defenders of Wildlife* court deemed the plan's focus on downlisting the species to threatened to be beyond the scope of review, it would have allowed the Service to shirk the duty of planning for species recovery altogether. Instead, today the Sonoran pronghorn's revised recovery plan includes criteria for delisting. Service, *Recovery Plan for the Sonoran Pronghorn* vii (2016), *available at* https://www.fws.gov/southwest/es/arizona/Documents/SpeciesDocs/SonoranPronghorn/FINAL_Sonoran_Pronghorn_Recovery%20Plan_2nd%20Revision_11-16-16.pdf. The corrected recovery plan also identified, among other things, the need for the creation of water catchments to provide the Sonoran pronghorn with access to water in the face of drought. *Id.* at

28–29. These catchments were implemented, have been "hugely successful in improving the lot of Sonoran pronghorn," and the species is now rebounding. Service, *Rare Sonoran Pronghorn are Rebounding, available at* https://medium.com/usfws/rare-sonoran-pronghorn-are-rebounding-5de9c5343ded. Judicial review of the content of recovery plans is thus crucial to ensuring that the "cornerstone and ultimate purpose" of the ESA—species recovery—is achieved. Service, *Report to Congress on the Recovery Program for Threatened and Endangered Species* 2 (1996).

The recovery plan for the bull trout at issue in this case has all the hallmarks of the type of vague, unenforceable plan that Congress sought to prevent through the 1988 amendment to the ESA. In the same way the deficient Northern Rocky Mountain Wolf Recovery Plan only vaguely required agencies to "minimize direct, man-caused mortality," the bull trout plan here only vaguely requires that "primary threats" be "effectively managed," providing little guidance as to what the "primary threats" are and what it means for them to be managed "effectively." Service, *Recovery Plan for the Coterminous United States Population of Bull Trout* 46 (2015), ER 75-269; Complaint at ¶ 1, *Friends of the Wild Swan, Inc. v. Thorson*, No. 3:16-cv-681-AC, (D. Or. June 1, 2017), ER 39 ("the Plan fails to insure the long-term survival and recovery of the species . . . [and is] devoid of any objective population criteria").

If this Court were to hold that the deficiencies of the bull trout recovery plan may not be challenged because of a jurisdictional bar to suit, it would cut off the Court's ability to ensure that the mandatory requirements of the ESA are being carried out for the bull trout and other imperiled species, and would effectively undo Congress's repeated efforts to strengthen recovery planning requirements. Without judicial review, plans could proliferate that at best include only vague and unenforceable goals, and at worst arbitrarily include goals that set imperiled species on a course towards extinction rather than survival. Conservation Amici therefore respectfully request that this Court take this opportunity to ensure that the ESA's recovery planning requirements are meaningfully enforced by holding that agency compliance with this crucial part of the ESA is subject to judicial review.

## II. THE COURT MAY REVIEW THE ADEQUACY OF A RECOVERY PLAN UNDER THE ENDANGERED SPECIES ACT'S CITIZEN SUIT PROVISION.

Whether a recovery plan meets the requirements of 16 U.S.C. § 1533(f)—including, critically, the requirement that such plans actually provide "for the conservation and survival of endangered species and threatened species," *id.*

§ 1533(f)(1)—is reviewable under the ESA's citizen suit provision. The district court erred in holding otherwise, and its decision should be reversed.[3]

Most federal environmental protection statutes, including the Endangered Species Act, contain citizen suit provisions that allow citizens to take legal action to remedy the failure of the statute's administrator to perform "any act or duty . . . which is not discretionary." *See, e.g.*, 16 U.S.C. § 1540(g)(1)(C) (Endangered Species Act); 42 U.S.C. § 7604(a)(2) (Clean Air Act); 33 U.S.C. § 1365(a)(2) (Clean Water Act); 42 U.S.C. § 9659(a)(2) (Comprehensive Environmental Response, Compensation, and Liability Act); 42 U.S.C. § 6972(a)(2) (Resource Conservation and Recovery Act). As the Supreme Court has observed, "the obvious purpose" of such provisions "is to encourage enforcement by so-called 'private attorneys general.'" *Bennett v. Spear*, 520 U.S. 154, 165 (1997); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 263 (1975)

[3] Where, as here, the ESA's citizen-suit provision applies, the Administrative Procedure Act ("APA") does not provide jurisdiction. *See* 5 U.S.C. § 704 (APA provision for judicial review of "final agency action for which there is no other adequate remedy in a court"); *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005), *abrogated in other part by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495–95 (9th Cir. 2011). Therefore, although Conservation Amici here agree with Plaintiffs that if the ESA did not provide jurisdiction the APA would, the Court need not address that issue. Conservation Amici thus have addressed only the ESA jurisdictional arguments in this brief.

(recognizing that, in enacting, *inter alia*, citizen suit provisions, "Congress has opted to rely heavily on private enforcement to implement public policy").

To determine whether a citizen suit provision confers jurisdiction to hear a particular challenge, courts look to the plain language of the statute and apply traditional tools of statutory interpretation to discern whether the statute creates a nondiscretionary duty enforceable by a citizen suit. *See, e.g., Bennett*, 520 U.S. at 172; *Our Children's Earth Found. v. EPA*, 527 F.3d 842, 851 (9th Cir. 2008); *WildEarth Guardians v. McCarthy*, 772 F.3d 1179, 1182 (9th Cir. 2014). In evaluating the statute's text for a nondiscretionary duty, courts look for a "specific, unequivocal command" from the statute. *WildEarth Guardians*, 772 F.3d at 1182. Courts typically find this unequivocal command when the statute uses terms of obligation, such as "shall." *See*, *e.g., Alabama v. Bozeman,* 533 U.S. 146, 153 (2001) ("[t]he word 'shall' is ordinarily the language of command") (quotation marks and citation omitted); *Gonzalez v. Thaler*, 565 U.S. 134, 146 (2012) (implying that use of the word "shall" is a mandatory prescription). Because the question before the court is whether the statute unequivocally creates a mandatory duty, the court will not defer to the agency's interpretation of the statute. *Our Children's Earth Found.*, 527 F.3d at 851.

For example, in *Bennett v. Spear*, the U.S. Supreme Court found that plaintiffs could bring suit under the ESA's citizen suit provision when the

underlying statute required that the Service "shall" perform the challenged duty. 520 U.S. at 172. Plaintiffs had challenged the Service's failure to consider economic impact when designating critical habitat under 16 U.S.C. § 1533(b)(2). *Id.* The Service argued that section 1533(b)(2) provides for discretion on the part of the Service as to the ultimate decision, and therefore a claim that it failed to comply with section 1533(b)(2) was not reviewable under the ESA's citizen suit provision. *Id.* The Supreme Court disagreed. *Id.* It held that "the terms of § 1533(b)(2) are plainly those of obligation rather than discretion" because it requires that the Secretary "*shall* designate critical habitat . . . after taking into consideration the economic impact . . . of specifying any particular area as critical habitat." *Id.* (emphasis in original). Although the Court agreed the Secretary maintained some discretion as to the ultimate substance of the designation, the Court explained that "[i]t is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Id.* Accordingly, plaintiffs' claim that the Secretary had failed to take into consideration economic impact when designating critical habitat was reviewable under the citizen suit provision. *Id.*

Further, this Court in *Association of California Water Agencies v. Evans*, 386 F.3d 879 (9th Cir. 2004), applied *Bennett* to hold that the scope of such review extends to the substance of the Secretary's economic impact assessment.

Specifically, the Court held that a challenge to the National Marine Fisheries Service's "incremental effects" methodology for conducting an economic impact assessment when designating critical habitat was actionable under the ESA citizen suit provision. *See id.* at 883–84. The Court rejected the agency's argument that this aspect of its duty was discretionary, holding that the citizen suit provision was properly invoked where plaintiffs alleged that, under the "incremental effects" approach, "the Secretary does not perform a proper economic impact analysis of the effects of designating a critical habitat." *Id.* at 884.

Following the analysis in *Bennett* and *Association of California Water Agencies*, this Court should hold that the ESA obligates the Secretary to perform several nondiscretionary duties in developing recovery plans. The statute provides that the Secretary has a nondiscretionary duty to ensure that a recovery plan is in fact designed to provide for the conservation and survival of endangered species and threatened species. ESA Section 4(f)(1) requires that the Secretary "*shall* develop and implement plans . . . for the conservation and survival of endangered and threatened species . . . unless he finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1) (emphasis added). Thus, absent a finding that a plan would not promote conservation of the species, the Secretary has no discretion not to develop a plan, or to develop a plan that fails to provide for the conservation and survival of the species. A claim that the Secretary

has failed to develop a plan, or that the plan is not crafted so as to bring about the conservation and survival of the species, is therefore reviewable under the ESA's citizen suit provision. Several district courts within this Circuit have so held. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137, 1150–51 (N.D. Cal. 2014) ("Section 1533(f) requires [the Service] to either issue a recovery plan or determine that a recovery plan will not promote the conservation of the species, and does not permit [the Service] the discretion to do neither."); *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1093 (D. Ariz. 2009) (holding that Service's failure to prepare a recovery plan was contrary to the ESA); *Friends of the Wild Swan v. Ashe,* 18 F. Supp. 3d 1077, 1081 (D. Mont. 2014) (holding that the Service was required to prepare a recovery plan, and that it had unreasonably delayed doing so); *Defs. of Wildlife v. Jewell*, No. CV-14-02472-TUC-JGZ, 2015 WL 11182029, at *8 (D. Ariz. Sept. 30, 2015) ("It is clear that under Section 4(f), the Secretary must develop and implement a Recovery Plan that provides for both the conservation and survival of the species." (emphasis omitted)).

To ensure that the Secretary develops a plan that will adequately provide for the conservation and survival of species, 16 U.S.C. § 1533(f)(1)(B) imposes three requirements for these plans that the Secretary "*shall*" incorporate "to the maximum extent practicable":

> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
>
> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and
>
> (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1) (emphasis added).

The duty to incorporate these elements into the plan is also not discretionary. The phrase "maximum extent practicable" in ESA Section 4(f)(1) "does not permit an agency unbridled discretion. It imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." *Fund for Animals*, 903 F. Supp. at 107. Thus, "[a] recovery plan that recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard." *Id.* at 108, 111–12 (holding that a recovery plan that failed to ensure that the recovery criteria for the grizzly bear would lead to its ultimate delisting was inadequate). By the same measure, a plan that failed to include site-specific management actions necessary for the species' conservation and survival, that failed to incorporate objective, measurable criteria that, when met, would lead to the species' delisting, or that

failed to include time and cost estimates needed to achieve the plan's goal, would be inadequate. *Defs. of Wildlife*, 130 F. Supp. 2d at 135.

In this regard, it is important to observe that the ESA does not require the Service merely to incorporate "site-specific management actions" into a recovery plan, but rather specifically demands incorporation of "such site-specific management actions *as may be necessary to achieve the plan's goal for the conservation and survival of the species*." 16 U.S.C. § 1533(f)(1)(B)(i) (emphasis added). Similarly, the Act does not require the Service merely to incorporate "objective, measurable criteria" into a recovery plan, but rather explicitly mandates incorporation of "objective, measurable criteria *which, when met, would result in a determination . . . that the species be removed from the list* [of endangered and threatened species]." 16 U.S.C. § 1533(f)(1)(B)(ii) (emphasis added). In other words, the Service does not satisfy its ESA duties merely by incorporating specified elements into a recovery plan; rather, it must incorporate specified elements that will achieve specified objectives. Because these requirements are not discretionary, the failure of a recovery plan to satisfy them is reviewable under the ESA's citizen suit provision. *See, e.g.*, *Bennett*, 520 U.S. at 172 ("[s]ince it is the omission of these required procedures that petitioners complain of, their . . . claim is reviewable.").

The district court therefore erred when it concluded that "the way in which the Secretary incorporates § 1533(f)(1)(B)'s requirements into recovery plans is discretionary and thus not reviewable." *Friends of the Wild Swan*, 2017 WL 2399572, at *3, ER 8. The district court approved and adopted the findings and recommendation of a magistrate judge holding that, while a court could review whether a plan contained the rudimentary elements set forth in the requirements in section 1533(f)(1)—that is, whether the plan included sections labeled "site-specific management actions" and "objective, measurable criteria"—it was jurisdictionally barred from evaluating the far more important questions of whether the plan would provide "for the conservation and survival of endangered species and threatened species," 16 U.S.C. § 1533(f)(1); the chosen site-specific management actions would "achieve the plan's goal for the conservation and survival of the species," *id.* § 1533(a)(1)(B)(i); or meeting the recovery criteria in the plan would indeed "result in a determination . . . that the species be removed from the list." 16 U.S.C. § 1533(f)(1)(B)(ii). *See Friends of the Wild Swan*, 2017 WL 2399572, at *5 (adopting magistrate's findings and recommendation), ER 5; Findings and Recommendations of Magistrate Judge, *Friends of the Wild Swan, Inc. v. Thorson*, No. 3:16-cv-681-AC, slip op. at 15 (D. Or. Jan. 5, 2017) (holding that "the court lacks jurisdiction under the citizen-suit provision of the Act with regard to any claim challenging the general substance of a recovery plan"), ER 26.

In other words, under the district court's ruling, if the recovery plan for the grizzly bear did not contain *any* criteria for species delisting *whatsoever*, the court below would find that a challenge to the plan on that basis would be reviewable. But if the plan merely paid lip service to the Section 4(f) criteria, the court below would find the plan unreviewable, even if the criteria on their face defied the record before the agency or the best available science. Indeed, under the district court's approach, a challenge to a plan providing that "the grizzly shall be removed from the Endangered Species list once we've shot the last surviving member of the species" would not be reviewable because the plan provided an objective, measurable criteria for the species' delisting.

In reaching its conclusion, the district court cited *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1355 (9th Cir. 1978), to support the proposition that "it is clear from the statutory language [of the ESA's citizen suit provision] that Congress intended some acts of the Secretary to remain outside the purview of judicial review." *Friends of the Wild Swan*, 2017 WL 2399572, at *2, ER 6. But *Kennecott Copper* is inapposite. In *Kennecott Copper*, the Ninth Circuit noted that the administrator of the Environmental Protection Agency ("EPA") has a nondiscretionary duty to approve revisions to a state air pollution plan "if" he determines that the plan meets certain requirements, including the requirement that air quality standards are met to the extent feasible. *Id.* at 1354. The state of Nevada

had concluded that certain emission control requirements were economically infeasible in its state plan, and proposed that EPA approve a plan revision relaxing the requirements. *Id.* at 1352. Before EPA could evaluate the proposal, a polluter who also wanted the controls relaxed immediately sued EPA, claiming EPA had a mandatory duty to accept the State of Nevada's determination and approve the revision. *Id.* This Court disagreed. It held that EPA had discretion to make an independent determination as to whether the plan could be revised, and that the polluter could not file suit under the Clean Air Act's citizen suit provision in an attempt to have "the state . . . dictate to the Administrator how he should perform his discretionary duties." *Kennecott Copper*, *Id.* at 1355. The Court took pains, however, to explain that the Administrator's ultimate decision, once made, would not be "beyond the reach of proper judicial review." *Id.* In sum, *Kennecott Copper*, which dealt with a plaintiff attempting to force the outcome of a discretionary decision before it was made, has no bearing on the question before the Court here of whether a court may review a finalized recovery plan for compliance with the mandatory requirements outlined in 16 U.S.C. § 1533(f).

This Court should reject the district court's unfounded reading of the citizen suit provision. In the same way that a court is not jurisdictionally barred under *Bennett* and *Association of California Water Agencies* from reviewing whether the Service's critical habitat designation has considered the designation's economic

impact—including whether the Service "perform[ed] *a proper* economic impact analysis," 386 F.3d at 884 (emphasis added)—it is not barred from reviewing whether a recovery plan issued by the Service will actually provide for species recovery. In this regard, it is standard practice in administrative law for courts to review an agency action challenged under citizen suit provisions for whether it was "arbitrary and capricious"—recognizing that even when an agency has some discretion, that discretion is bounded and reviewable. *W. Watersheds Project*, 632 F.3d at 481 ("Irrespective of whether an ESA claim is brought under the APA or the citizen-suit provision, the APA's 'arbitrary and capricious' standard applies[.]"). Accordingly, under the ESA's citizen suit provision, courts may adjudicate whether the Service's determination that, for example, a recovery plan's site-specific management actions will "achieve the plan's goal for the conservation and survival of the species," 16 U.S.C. § 1533(f)(1)(B)(i), was arbitrary and capricious.

That Congress plainly contemplated such review is reinforced by two features of the ESA. Although, as the Supreme Court held in *Bennett*, the citizen suit provision of the ESA does not encompass obligations imposed by all of the ESA's various provisions, it expressly *does* include the obligations imposed by Section 4 of the Act, including the recovery plan provisions. *See* 16 U.S.C.

§ 1540(g)(1)(C). Plainly, therefore, Congress wanted meaningful judicial review of whether the Service is abiding by its recovery plan obligations.

In addition, Section 4(f) imposes an explicit requirement on the Service to *solicit and consider public comment* before finalizing recovery plans (or revisions). *See* 16 U.S.C. § 1533(f)(4) ("The Secretary shall, prior to final approval of a new or revised plan, provide public notice and an opportunity to comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan."). It would make no sense for Congress to mandate the Service's solicitation and consideration of public comment and yet intend that a court could not even review the Service's plan for whether the public's views were afforded any consideration or, rather, were arbitrarily ignored.

Finally, applying such "arbitrary and capricious" review to the question whether the Service's chosen action would advance or achieve species recovery in compliance with ESA Section 4(f) does not invade any legitimate discretionary prerogative of the agency. To the contrary, this Court has frequently addressed similar questions in other statutory contexts under the ESA. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931–33 (9th Cir. 2008) (reviewing ESA section 7 biological opinion to determine whether "its jeopardy analysis . . . adequately consider[ed] the proposed actions' impacts on the listed species' chances of recovery"); *Nat. Res. Def. Council v. U.S. Dep't of the Interior*,

113 F.3d 1121, 1126–1127 (9th Cir. 1997) (finding that the Service "failed to discharge its statutory obligation to designate critical habitat" for the gnatcatcher when the Service arbitrarily concluded that designation of critical habitat for the gnatcatcher would not be "beneficial to the species"). Nothing in the statutory text indicates that Congress meant to carve out different treatment for the Service's recovery-related determinations in the context of recovery planning itself. Indeed, it would be a peculiar rule to hold that the courts could review the substance of the Service's recovery-related determinations in other ESA contexts, but not when adjudicating the Service's compliance with Section 4(f), the Act's central mandate for recovery planning that Congress twice amended the ESA to achieve.

## CONCLUSION

It is critical that recovery plans provide for "the conservation and survival" of our nation's imperiled species. Judicial review is a crucial part of enforcing this mandate. For the foregoing reasons, Conservation Amici urge the Court to reverse the ruling of the district court, and ensure that the protections of the Endangered Species Act are upheld.

Respectfully submitted,

Dated: November 27, 2017

s/ Elizabeth B. Forsyth
ELIZABETH FORSYTH
TIMOTHY J. PRESO
Earthjustice
*Attorneys for Conservation Amici*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

Pursuant to Federal Rule of Appellate Procedure 29(a)(5), I hereby certify that this brief complies with the word limitations set forth in Federal Rule of Appellate Procedure 29(a)(5), and Circuit Rule 32-1(a). This brief is proportionally spaced, has a typeface of 14 points and contains 6,651 words.

DATED: November 27, 2017

s/ Elizabeth Forsyth
ELIZABETH FORSYTH

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on 27th day of November, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellant CM/ECF system.

/s/ Elizabeth Forsyth
Elizabeth Forsyth